(No. 49625.—

*In re* APPLICATION OF ROBERT G. SKIDMORE, County Treasurer, Appellant.—(Illinois State Toll Highway Authority *et al.,* Appellees.)

*Opinion filed Jan. 26, 1979.—Rehearing denied March 30, 1979.*

34

UNDERWOOD and RYAN, JJ., dissenting.

Dennis P. Ryan, State's Attorney, of Waukegan (Gary Neddenriep, Assistant State's Attorney, of counsel), for appellant.

William J. Scott, Attorney General, of Springfield (Tanya K. Dietrich and John R. Lavery, Special Assistant Attorneys General, of Oak Brook, of counsel), for appellees.

Allyn J. Franke, of Franke & Miller, of Chicago, for *amicus curiae* local taxing bodies, in the counties of Lake, Cook and DeKalb.

MR. CHIEF JUSTICE GOLDENHERSH delivered the opinion of the court:

The taxing authorities of Lake County assessed real estate taxes for the year 1970 in the amount of $29,826.40 on the leasehold interest of Standard Oil Division of the American Oil Company in property owned

by the Illinois State Toll Highway Authority. The property involved is the Lake Forest Tollway oasis owned by the Authority and leased to the Standard Oil Division of the American Oil Company. The Authority and Standard Oil paid the taxes under protest and filed objections to the application for judgment of the county treasurer and *ex-officio* collector of Lake County. The circuit court of Lake County, relying on *Illinois State Toll Highway Com. v. Korzen* (1965), 32 Ill. 2d 338, held that the leasehold interest was exempt from taxation and enjoined the county officials and their successors in office "from assessing, levying, collecting or attempting to assess, levy or collect" general real estate taxes on the leasehold interest.

As originally enacted in 1953 and as reenacted in 1967, the toll highways act (see Ill. Rev. Stat. 1953, ch. 121, par. 314a43; Ill. Rev. Stat. 1967, ch. 121, par. 100–22) provided: "All property belonging to the Commission [Authority], and the said toll highways, shall be exempt from taxation." Effective October 1, 1973, section 22 was amended to provide: "All property belonging to the Authority, and the toll highways, shall be exempt from taxation. However, such part of that property as has heretofore been or shall hereafter be leased by the Authority to a private individual, association or corporation for a use which is not exempted from taxation under Section 19 of the Revenue Act of 1939, is subject to taxation as provided in Section 26 of the Revenue Act of 1939, regardless of any provision in such a lease to the contrary." (Ill. Rev. Stat. 1973, ch. 121, par. 100–22.) The collector filed a motion in the circuit court to vacate that part of the decree which found the leasehold interest to be exempt from taxation and enjoined the county officials from attempting to tax it. The circuit court ordered that that portion of the decree which enjoined the assessment, levy or collection of taxes on the leasehold

interest be vacated and the injunction dissolved. The Authority appealed and the appellate court, finding that the amendment to section 22 of the toll highways act "was a law impairing the obligation of the contract both as to the Authority and Standard Oil," held that there was "an impairment of a valid, existing contract contrary to the provisions *** of the Illinois Constitution." (47 Ill. App. 3d 954, 960.) The collector appealed. Supreme Court Rule 317 (58 Ill. 2d R. 317).

The collector contends that the termination of the tax exemption for leasehold interests in tollway oases did not impair any contractual obligation between the Authority or its lessee, or between the Authority and the holders of its bonds issued prior to the enactment of the amendment. It is the Authority's position that its property is State property and therefore exempt from all general property taxation; that leaseholds in tollway property used as oases are a part of the contemplated public service and function of the Authority and such use is therefore exempt from taxation; and that this court has previously recognized that the toll highways act is a valid and binding contract entered into by the State.

In *Small v. Pangle* (1975), 60 Ill. 2d 510, 514, the court, in discussing the interpretation of section 6 of article IX of the Constitution of 1970, said:

"The above [article IX, section 6] is clearly nothing more than a rephrasing of a similar provision contained in section 3 of article IX of the Illinois Constitution of 1870. Those cases interpreting the permissive legislative exemptions under the Constitution of 1870 are equally relevant to the limits of exemption now constitutionally permitted.

The basic premise, that statutes providing exemption from taxation shall be strictly construed because article IX of the Constitution

subjects all property to taxation (see *Wesley Willows v. Munson* (1969), 43 Ill. 2d 203, 207), remains valid. Also see *People ex rel. Nordlund v. Winnebago Home for the Aged* (1968), 40 Ill. 2d 91."

Since all presumptions are to the contrary, the intention that the State be bound by an exemption must be clearly stated. (*People ex rel. Murray v. City of St. Louis* (1920), 291 Ill. 600, 606.) As a general rule a taxpayer has no vested right in the continued existence of a taxing statute. *People ex rel. Harding v. Chicago & Northwestern Ry. Co.* (1930), 340 Ill. 102; *People ex rel. Campe v. Board of Review* (1919), 290 Ill. 467.

Whether the statute creates contractual rights is to a great extent dependent upon the language used. (*Dodge v. Board of Education* (1937), 302 U.S. 74, 87 L. Ed. 57, 58 S. Ct. 98.) The law enacted in 1855 granting the exemption upheld in *People ex rel. County Collector v. Northwestern University* (1972), 51 Ill. 2d 131, provided: " 'That all property, of whatever kind or description, belonging to or owned by said corporation [Northwestern University], shall be forever free from taxation for any and all purposes.' " (51 Ill. 2d 131, 132.) In *United States Trust Co. v. New Jersey* (1977), 431 U.S. 1, 52 L. Ed. 2d 92, 97 S. Ct. 1505, in which the Supreme Court held that New Jersey's repeal of a statute previously enacted by both New York and New Jersey violated the contract clause of the Constitution of the United States, the statute in relevant part provided:

" 'The 2 States covenant and agree with each other and with the holders of any affected bonds, as hereinafter defined, that so long as any of such bonds remain outstanding and unpaid and the holders thereof shall not have given their consent as provided in their contract with the port authority, (a) *** and (b) neither the States nor

the port authority nor any subsidiary corporation incorporated for any of the purposes of this act will apply any of the rentals, tolls, fares, fees, charges, revenues or reserves, which have been or shall be pledged in whole or in part as security for such bonds, for any railroad purposes whatsoever other than permitted purposes hereinafter set forth.' 1962 N.J. Laws, c. 8, sec. 6; 1962 N.Y. Laws, c. 209, sec. 6." 431 U.S. 1, 9-10, 52 L. Ed. 2d 92, 101-02, 97 S. Ct. 1505, 1511.

The section of the toll highways act in which the exemption was granted contained no language which would serve to create a contract that the grant of exemption would remain in force. In *People ex rel. Campe v. Board of Review* (1919), 290 Ill. 467, the court held that a taxpayer had no vested rights under a statute providing that a certain portion of the actual value of property was to be the basis for assessment for taxation and that the General Assembly was empowered to change the basis at any time. In *Dodge v. Board of Education* (1936), 364 Ill. 547, in rejecting the contention that the amendment to the Act relating to the compulsory retirement of school teachers was invalid as taking away vested rights to future installments of pensions for teachers who had retired or applied for retirement under the law as it existed prior to the amendment, the court said, "A right, to be within the protection of the constitution, must be a vested right. It must be something more than a mere expectancy based upon an anticipated continuance of an existing law. If before rights become vested in particular individuals the convenience of the State induces amendment or repeal, such individuals have no cause to complain." (*Dodge v. Board of Education* (1936), 364 Ill. 547, 552.) We perceive no reason to hold that absent a clearly stated intent to the contrary the grant of the exemption from taxation here created any greater rights than did the

statutes upon which the claims of contractual rights in the foregoing cases were based.

We consider next the Authority's contention that the property is exempt because it is State property. We agree with the appellate court that this contention is without merit (47 Ill. App. 3d 954, 956) for the reason that the property sought to be taxed is not State property, but a leasehold interest of Standard Oil. (*Nabisco, Inc. v. Korzen* (1977), 68 Ill. 2d 451.) Concerning the contention that because the oases are a part of the Authority's contemplated public service and function the leasehold interest is exempt, we hold, as did the appellate court, that in enacting the amendment the General Assembly intended "to negate the effect of the decision in *Illinois State Toll Highway Commission v. Korzen.*" 47 Ill. App. 3d 954, 957.

We have considered the Authority's argument that in *People v. Illinois Toll Highway Com.* (1954), 3 Ill. 2d 218, and *Continental Illinois National Bank & Trust Co. v. Illinois State Toll Highway Com.* (1969), 42 Ill. 2d 385, "This court has recognized the Tollway Act to be a valid and binding contract entered into by the State." We find nothing in those opinions which would support the Authority's claim of a contractual right to a continuation of the exemption.

For the reasons stated, the judgment of the appellate court is reversed, and the judgment of the circuit court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

MR. JUSTICE UNDERWOOD, dissenting:

While agreeing with Mr. Justice Ryan, it seems to me necessary to emphasize to a greater degree than does his dissenting opinion the particular reasons for my disagreement with the court. I believe that where there are

outstanding bonds issued by the Illinois State Toll Highway Authority and its predecessor under enabling acts (Ill. Rev. Stat. 1953, ch. 121, par. 314a26 *et seq.*; Ill. Rev. Stat. 1967, ch. 121, par. 100—1 *et seq.*) that make the bonds payable solely from revenues of the Authority (Ill. Rev. Stat. 1953, ch. 121, par. 314a39, currently Ill. Rev. Stat. 1977, ch. 121, par. 100—17), which at the time of issue were not encumbered by tax (Ill. Rev. Stat. 1953, ch. 121, par. 314a43), action by the State which now reduces those revenues by subjecting them to tax impairs the obligation of the Authority's contract with the bondholders in violation of the United States and Illinois constitutions (U.S. Const., art. I, sec. 10; Ill. Const. 1970, art. 1, sec. 16). I base this belief partly on two recent United States Supreme Court decisions which, contrary to earlier speculations about the demise of the Federal contracts clause (see J. Nowak, R. Rotunda & J. Young, Constitutional Law 427 (1978)), demonstrate that the clause still restrains a State's ability to modify both private and public contracts.

In *United States Trust Co. v. New Jersey* (1977), 431 U.S. 1, 52 L. Ed. 2d 92, 97 S. Ct. 1505, the Supreme Court invalidated a State statute as impairing the obligation of one of the State's own contracts. New York and New Jersey had enacted a bi-State compact establishing a port authority with power to issue bonds secured by the revenues from its operations. In 1962 the two States enacted statutory covenants with holders of these bonds that revenues pledged to outstanding issues would not be used for other than certain specified purposes. In 1974, during the energy crisis, both States repealed the covenant in order to finance mass-transit improvements deemed vital to encouraging reduction of automobile use. In considering whether this repeal violated the contracts clause, the court employed a two-step analysis, first inquiring whether there had been a technical impairment of a contract and then

asking whether the impairment was one permitted by the Constitution. The court found that the 1962 covenant constituted a contract between the State and the bond-holders and that its repeal impaired the obligation of this contract, quoting with approval the trial court's conclusion:

"To the extent that the repeal of the covenant authorizes the Authority to assume greater deficits for [mass transport] purposes, it permits a diminution of the pledged revenues and reserves and may be said to constitute an impairment of the states' contract with the bondholders." 431 U.S. 1, 20-21, 52 L. Ed. 2d 92, 108, 97 S. Ct. 1505, 1517.

The court then considered the constitutionality of the repealer by weighing this impairment against the State's reserved power to enact general regulatory measures. Although a State cannot "contract away" its police power or power of eminent domain, it can bind itself to a future exercise of its taxing and spending power. The court held:

"Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." (431 U.S. 1, 22, 52 L. Ed. 2d 92, 109-10, 97 S. Ct. 1505, 1518, citing *Home Building & Loan Association v. Blaisdell* (1934), 290 U.S. 398, 445-47, 78 L. Ed. 413, 432-34, 54 S. Ct. 231, 242-43.)

Further, the court reasoned that when impairment of private contracts was at stake, courts would "defer to legislative judgment as to the necessity and reasonableness of a particular measure." (431 U.S. 1, 23, 52 L. Ed. 2d 92, 110, 97 S. Ct. 1505, 1518.) When the State impaired the obligation of its own contracts, however, no such deference was due "because the State's self-interest [was] at

stake." (431 U.S. 1, 26, 52 L. Ed. 2d 92, 112, 97 S. Ct. 1505, 1520.) The court concluded that although energy conservation and environmental improvement, the legislative purposes claimed by the State, were "admittedly important" (431 U.S. 1, 29, 52 L. Ed. 2d 92, 114, 97 S. Ct. 1505, 1521), the repealer was neither necessary to encourage reduction of automobile use nor reasonable in the circumstances and therefore could not survive the constitutional challenge.

In *Allied Structural Steel Co. v. Spannaus* (1978), 438 U.S. 234, 57 L. Ed. 2d 727, 98 S. Ct. 2716, the Supreme Court invalidated a State statute as impairing the obligation of a private contract. Allied, an Illinois corporation with a Minnesota office, had adopted a pension plan in 1963, to which it was the sole contributor and to which it made contributions each year based on predictions of eventual payout needs. In 1974 Minnesota enacted a law providing that an employer who had a voluntary pension plan and who either terminated the plan or closed a Minnesota office was subject to a charge unless pension funds were sufficient to provide considerably more extensive coverage than Allied's plan did. Allied closed its Minnesota office and was notified by the State that it owed a considerable sum under the provisions of the act.

In considering the constitutionality of the Minnesota law, the court followed the same two-step analysis it had used in *United States Trust Co.* It found that there had been an impairment of Allied's contract with its employees because the act imposed obligations on the company far beyond those it had undertaken and reasonably relied on. In balancing this impairment against the State's reserved power to legislate for the public welfare, the court found no showing that "this severe disruption of contractual expectations was necessary to meet an important general social problem" (438 U.S. 234, 247, 57 L. Ed. 2d 727, 738, 98 S. Ct. 2716, 2724), since the act applied only to

private employers who had pension plans and who closed a Minnesota office. The court concluded that the impairment was constitutionally prohibited.

The initial inquiry in the case before us is whether the partial repeal of the tax exemption challenged here (Ill. Rev. Stat. 1973, ch. 121, par. 100—22) constitutes a technical impairment of the obligation of the Authority's contract with the bondholders. The amendment by its terms applies only to property leased by the Authority to private parties, but the pass-through provisions in the affected leases ensure that the effect is the same as if the Authority had been taxed directly. The precise question, therefore, is this: Where the State has authorized the Authority to issue bonds secured solely by its revenues (Ill. Rev. Stat. 1953, ch. 121, par. 314a39, currently Ill. Rev. Stat. 1977, ch. 121, par. 100—17), and provided that these revenues shall not be diverted (Ill. Rev. Stat. 1953, ch. 121, par. 314a45, currently Ill. Rev. Stat. 1977, ch. 121, par. 100—24), does the State's subsequent reduction of these revenues by statute impair the obligation of the contract between the Authority and the bondholders? I think it must be admitted that it does. As the Supreme Court noted in *United States Trust Co.*: "Nor was the covenant merely modified or replaced by an arguably comparable security provision. Its outright repeal totally eliminated an important security provision and thus impaired the obligation of the States' contract." (431 U.S. 1, 19, 52 L. Ed. 2d 92, 108, 97 S. Ct. 1505, 1516.) If the legislature can reduce the Authority's revenues in this manner, why can it not modify or repeal the Authority's statutory power to fix and collect tolls (Ill. Rev. Stat. 1977, ch. 121, pars. 100—10, 100—11), thus effectively nullifying the bondholders' security and diminishing the value of the bonds. There is, of course, no question that this would impair the obligation of the Authority's contract with the bondholders. Although the reduction in

the Authority's revenues challenged here is smaller, any such reduction which diverts the revenues from this statutorily pledged purpose constitutes at least a technical impairment of obligations under the contract, a frustration of legitimate expectations with which the bondholders entered into the contract.

This impairment, however, will not violate the Constitution if it comes within the State's reserved power to enact general regulations for the public welfare. The Supreme Court has scrutinized the reasonableness and necessity of such legislation more closely when the obligations impaired were those of the State's own contracts than when only private contracts were affected, because in the former case the State stands to profit from the impairment. (*United States Trust Co. v. New Jersey* (1977), 431 U.S. 1, 23, 25, 52 L. Ed. 2d 92, 110, 112, 97 S. Ct. 1505, 1518, 1520.) The majority points out that no express statutory covenant between the State and the bondholders is involved here, as it was in *United States Trust Co.* Neither was the contract between the Authority and the bondholders purely private, however. The State gave the Authority power to issue bonds secured by its revenues, and the State created those revenues by giving the Authority power to fix and collect tolls and by exempting the Authority's property from tax. Moreover, following the Supreme Court's reasoning, the impairment of this contract should be subjected to the closer scrutiny reserved for public contracts because it is the State, through its units of local government, which stands to profit from the impairment.

In this case, however, it is immaterial how strict or how relaxed a standard of review is applied to the impairment of the bondholders' contract. As in *Allied Structural Steel,* there is no showing here that the amendment partially repealing the tax exemption was enacted to deal with a general or pressing social problem.

On the contrary, it is clear from the amendment's legislative history that its sole purpose was to place back on the tax rolls property now leased by the Toll Highway Authority to private entities at tollway oases, thus legislatively overruling *Illinois State Toll Highway Com. v. Korzen* (1965), 32 Ill. 2d 338, 341, in which this court held that "[t]he public purpose in exempting [the Authority's] property from taxation would not be fully recognized" unless leasehold interests in tollway oases were included in the exemption. It is evident that this public purpose was to secure the bonds issued by the Authority, since this was the principal purpose to which the Authority's revenues were pledged by statute. I conclude that for the State to repeal the exemption for the sole purpose of repudiating legislation enacted when the Authority was created and which served as the basis for the issuance of the bonds violates the contracts clause.

Nor does the fact that the challenged amendment involves the State's taxing power alter my conclusion. The court reasons that statutes granting tax exemptions are to be strictly construed and that, in general, beneficiaries of such exemptions have no legitimate expectation of their continued existence absent an express statutory covenant to the contrary. Although these general principles are correct, they are not helpful in determining the extent of the limitations that the contracts clause places on the State's power to modify contractual obligations. The bondholders surely had a legitimate expectation that the State would not unnecessarily eliminate a part of the Authority's revenues, which were granted to it by a statute which also provided that those revenues should serve as sole security for the bonds and would not be diverted to other purposes.

I would therefore affirm the judgment of the appellate court.

MR. JUSTICE RYAN, also dissenting:

I join with Mr. Justice Underwood in his dissent, and in addition thereto state the following reasons for my disagreement with the majority opinion.

I believe that the amendment to section 22 of the toll highway act, effective October 1, 1973 (Ill. Rev. Stat. 1973, ch. 121, par. 100—22), under which the leasehold interest is sought to be taxed in this case, is unconstitutional as an impairment of the obligation of the State's contract with the Illinois State Toll Highway Authority and the obligation of the bonds issued by the Authority.

I have no quarrel with the general proposition of law stated by the majority: "As a general rule a taxpayer has no vested right in the continued existence of a taxing statute." (75 Ill. 2d at 38.) However, this proposition has no application to this case. A simple reading of the cases cited by the majority in support of this general statement of law shows that these cases and this proposition are not relevant to the facts in our case. Both *People ex rel. Harding v. Chicago & Northwestern Ry. Co.* (1930), 340 Ill. 102, and *People ex rel. Campe v. Board of Review* (1919), 290 Ill. 467, involved amendments changing the percentage of the value of the property that should be used as the assessed value upon which taxes are computed. Such general statutes do not confer rights upon taxpayers. They are considered to be directions to the assessment and taxing officials. (See *Ohio Life Insurance & Trust Co. v. Debolt* (1853), 57 U.S. (16 How.) 416, 14 L. Ed. 997, 1005.) As such, they are acts of legislation which the State might modify or change according to the necessity of public service. The statute involved in our case, however, does not provide for, nor is it a part of, a general scheme of taxation applicable to all taxpayers or all taxpayers of a specified group, but instead is a special law creating the Illinois State Toll Highway Authority and the tax exemption provided in this act applies to the property of no other entity.

This same feature distinguishes our case from those wherein tax-exemption statutes have been termed "bounty statutes." In *East Saginaw Salt Manufacturing Co. v. City of East Saginaw* (1872), 80 U.S. (13 Wall.) 373, 20 L. Ed. 611, it was contended that a statute which provided that the property of all corporations formed for the purpose of manufacturing salt shall be exempt from taxation, and should receive from the State a bounty of 10 cents for each bushel of salt manufactured, constituted a contract, the obligation of which an amendatory act impaired by limiting the tax-exemption provision. The court held that the statute did not create a contract between the State and corporations which took advantage of the provisions of the statute, but that it was a bounty which was bestowed by the State upon those who complied with the law to which they were entitled so long as the law remained unrepealed. In *Welch v. Cook* (1879), 97 U.S. 541, 24 L. Ed. 1112, the Supreme Court again referred to a tax exemption contained in a general law as a bounty of the legislature.

In *Piqua Branch of the State Bank of Ohio v. Knoop* (1853), 57 U.S. (16 How.) 369, 14 L. Ed. 977, however, the courts dealt with an Ohio statute authorizing the incorporation of banks and not with a general statute relating to taxation. The statute provided that a bank organized under it shall pay to the State 6% of its profits, which sum "shall be in lieu of all taxes to which the company, or the stockholders therein, would otherwise be subject." (57 U.S. (16 How.), 369, 377, 14 L. Ed. 977, 980.) The plaintiff bank was organized under this act. Thereafter, the Ohio legislature enacted a law entitled "An act to tax banks and bank and other stocks, the same as property is now taxable by the laws of the State." (57 U.S. (16 How.) 369, 377, 14 L. Ed. 977, 980.) The Ohio Supreme Court had held that the section exempting the bank property from taxation was a law prescribing "a rule of taxation, until changed, and not a contract stipulating

against any change: a legislative command and not a legislative compact with these institutions." (57 U.S. (16 How.) 369, 379, 14 L. Ed. 977, 981.) The Supreme Court, however, stated that in its opinion the Act "does not import to be a legislative command nor a rule of taxation until changed, but a contract stipulating against any change." 57 U.S. (16 How.) 369, 382-83, 14 L. Ed. 977, 983.

In *East Saginaw Salt Manufacturing Co.* the court, in distinguishing the general nature of the act it was considering from the special act involved in *Piqua,* noted that as to corporations formed under the special act in *Piqua* "the scope of the act takes in the whole period for which the corporation is formed. The language means that, during the existence of any corporation formed under the act, the stipulation or exemption specified in it is to operate." (80 U.S. (13 Wall.) 373, 378, 20 L. Ed. 611, 614.) This distinction between a general statute containing tax exemptions designed to encourage persons to engage in a certain type of business and a special grant of an exemption to particular taxpayers was again noted by Mr. Justice Holmes in *Wisconsin & Michigan Ry. Co. v. Powers* (1903), 191 U.S. 379, 48 L. Ed. 229, 24 S. Ct. 107.

The majority opinion in our case holds that the toll highways act in which the exemption is granted "contained no language which would serve to create a contract that the grant of exemption would remain in force." (75 Ill. 2d at 39.) It is not necessary that an act contain the language similar to that found in the Northwestern University charter: "shall be forever free from taxation for any and all purposes" (*People ex rel. County Collector v. Northwestern University* (1972), 51 Ill. 2d 131, 132). In *Ohio Life Insurance & Trust Co. v. Debolt* (1853), 57 U.S. (16 How.) 416, 14 L. Ed. 997, the court held that it must determine from the statute whether the words used are words of contract and what is their true meaning. "[I] n

forming its judgment upon this subject, it can make no difference whether the instrument claimed to be a contract is in the form of a law passed by the legislature, or of a covenant or agreement by one of its agents acting under the authority of the State." (57 U.S. (16 How.) 416, 433, 14 L. Ed. 997, 1004.) In *Piqua* the special statute, which the court held created a contract with the banks, contained no language assuring a continued, irrevocable exemption similar to that contained in the Northwestern University charter, which the majority opinion in our case thinks is necessary. The statement in the majority opinion concerning the absence of language in the exemption in section 22 indicating a contract "that the grant of exemption would remain in force" (75 Ill. 2d at 39) is reminiscent of the language used by the Ohio Supreme Court in construing the statute involved in *Piqua.* The Ohio court stated: "It must be admitted the section contains no language importing a surrender of the right to alter the taxation prescribed ***." (*Debolt v. Ohio Life Insurance & Trust Co.* (1853), 1 Ohio St. 563, 575.) The Supreme Court in *Piqua,* however, looked not to the absence of language restricting subsequent legislative modification of the method of taxation, but to the context and purpose of the entire act, and arrived at a conclusion contrary to that of the Ohio court. The language of the act in *Piqua* simply provided that the banks should pay 6% of their profits, "which sum or amount so set off shall be in lieu of all taxes to which the company, or the stockholders therein, would otherwise be subject." (57 U.S. (16 How.) 369, 377, 14 L. Ed. 977, 980.) The court held that it would determine from the context in which the language was used whether or not a contract was created which could not be impaired by subsequent legislation.

Applying the distinction drawn by the above decisions of the Supreme Court, I can only conclude that the tax exemption granted by the toll highway act constituted a

covenant by the State that the property of the Authority would be exempt from taxation. I note first that the exemption was not a part of a general scheme of taxation and is contained not in a revenue act or a statute applicable to the public in general, but is contained in the toll highway act and relates solely to the property of the Authority. Also, it is not in the nature of a bounty or an exemption designed to encourage persons or corporations to engage in certain types of enterprises. It is, instead, a special grant to one entity alone—the toll highway authority. It is even a more specific grant than was the exemption in *Piqua,* which was contained in a banking act and was construed to be a grant to any corporation that was organized under the Act. The statute in question in our case is a comprehensive act designed to provide for the construction of a system of modern, safe highways in this State. (Ill. Rev. Stat. 1971, ch. 121, par. 100–1 *et seq.*) In order to accomplish this end, what is now the Illinois State Toll Highway Authority was created. It was granted the power to acquire land and to construct toll highways. It was also granted the authority to lease part of its property to others to be used as service stations and restaurants. (Ill. Rev. Stat. 1971, ch. 121, par. 100–11(e).) For the purpose of financing the construction of the system the Authority was given the power to issue bonds, which it was provided should not be an obligation of the State of Illinois but would be paid solely from the revenue of the Authority. The Act provided that each bond should bear on its face, printed in bold type, the words that the principal and interest of the bond "are payable out of the revenues derived from the operation of the toll highways of the Authority and all other income from whatever source derived." (Ill. Rev. Stat. 1971, ch. 121, par. 100–17.) Section 22 of the Act provided: "All property belonging to the Authority and the toll highways, shall be exempt from taxation." (Ill. Rev. Stat. 1971, ch. 121, par.

100–22.) The Act also provided that when the bonds are paid the toll highways shall become a part of the system of State highways of the State of Illinois. (Ill. Rev. Stat. 1971, ch. 121, par. 100–21.) Pursuant to this comprehensive act, the bonds were sold, the land was acquired, the highways were built, certain facilities were leased to others to provide service stations and restaurant facilities, and the revenue received, including that derived from the leases, was used as part of the "all other income from whatever source derived" to pay the principal and interest on the bonds.

I can only view this specific exemption from taxation granted solely to the property of the Authority, contained as it was in a comprehensive statute enacted for the purpose of providing a system of safe and modern highways which would ultimately become property of the State of Illinois, as a covenant by the State that the property of the Authority would not be subject to taxation. The purpose of the exemption was clearly to assure that there would not be diverted, from the purpose of the act, revenue of the Authority "from whatever source derived" which the statute and the bonds themselves provided should be used to pay the principal and interest of the bonds. At the time the bonds were sold, the leasehold interests, because of the exemption, were not taxable. (*Illinois State Toll Highway Com. v. Korzen* (1965), 32 Ill. 2d 338.) The amendment to section 22 removing this exemption diverts from the purpose of the act a certain amount of revenue that the bondholders could justifiably expect would be used in the payment of the obligations of the Authority which they had purchased. I would hold that the amendment to section 22 violated the covenant between the State and the Authority and impaired the obligation of the bonds that had been issued by the Authority and purchased by the bondholders in reliance upon the tax-exemption status of the leasehold interests.